# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN
## MILWAUKEE DIVISION

| | |
|---|---|
| RUDOLF FRANKENREITER, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> OLIPHANT FINANCIAL, LLC, ALPHA RECOVERY CORP., and FINANCIAL BUSINESS AND CONSUMER SOLUTIONS, INC, <br><br> Defendant. | Case No.: 19-cv-724 <br><br> **AMENDED CLASS ACTION COMPLAINT** <br><br> **Jury Trial Demanded** |

## INTRODUCTION

1.      This class action seeks redress for collection practices that violate the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* (the "FDCPA").

## JURISDICTION AND VENUE

2.      The court has jurisdiction to grant the relief sought by the Plaintiff pursuant to 15 U.S.C. § 1692k and 28 U.S.C. §§ 1331 and 1337. Venue in this District is proper in that Defendant directed its collection efforts into the District.

## PARTIES

3.      Plaintiff Rudolf Frankenreiter is an individual who resides in the Eastern District of Wisconsin (Milwaukee County).

4.      Plaintiff is a "consumer" as defined in the FDCPA, 15 U.S.C. § 1692a(3), in that Defendant sought to collect from Plaintiff a debt allegedly incurred for personal, family, or household purposes.

5.      Defendant Oliphant Financial, LLC ("Oliphant") is a foreign limited liability company with its primary offices located at 1800 2nd Street Suite 603, Sarasota, Florida 34236.

6. Oliphant is engaged in the business of a collection agency, using the mails and telephone to collect consumer debts originally owed to others.

7. Oliphant is engaged in the business of collecting debts originally owed to others and incurred for personal, family, or household purposes.

8. The FDCPA defines a "debt" as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment."

9. The FDCPA defines a "debt collector" as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, *or* who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6) (emphasis added); *see, e.g., Barbato v. Greystone All., LLC*, 916 F.3d 260, 265 (3d Cir. 2019); *Tepper v. Amos Fin., LLC*, 898 F.3d 364, 366 (3d Cir. 2018); *Skinner v. LVNV Funding LLC*, 2018 U.S. Dist. LEXIS 2812, at *7-8 (N.D. Ill. Jan 8, 2018); *Mitchell v. LVNV Funding LLC*, 2017 U.S. Dist. LEXIS 206440, at *7-12 (N.D. Ind. Dec. 15, 2017); *McMahon v. LVNV Funding, LLC*, 2018 U.S. Dist. LEXIS 41984, at *32-38 (N.D. Ill. Mar. 14, 2018); *Torres v. LVNV Funding, LLC*, 2018 U.S. Dist. LEXIS 49885, at *12-15 (Mar. 27, 2018).

10. Upon information and belief, Defendant's sole purpose and revenue source is the collection of consumer debts. *See, e.g., Barbato*, 916 F.3d at 265; *Valenta v. Midland Funding, LLC*, No. 17-cv-6609, 2019 U.S. Dist. LEXIS 53902, at *6-7 (N.D. Ill. Mar. 29, 2019).

11. Oliphant's website states:

## An Industry Pioneer

As one of the original debt purchasing organizations in the United States, Oliphant Financial, LLC. (Oliphant) has helped to shape and lead an industry that has emerged as a prevalent venue for the ARM needs of many types of creditors.

Founded in 1992, Oliphant has grown to match the needs of an ever expanding debt industry. To match those needs, Oliphant has diversified its corporate purpose to include varying sectors of the debt industry, including: debt buying/selling, debt servicing, and legal/agency outsourcing.

As a result of the pioneering efforts Oliphant took in the creation of the debt buying marketplace, and its continuing involvement today, OLIPHANT is well respected within the industry. By utilizing internal and outsourcing resources, Oliphant is well positioned to sustain its growth while weathering the normal cyclical nature of the industry.

OLIPHANT strives to maximize revenue while minimizing risk. By adhering to a corporate philosophy that emphasizes strict adherence to all applicable federal, state and local statutes, ordinances and regulations, Oliphant cements itself as a valuable member of the debt buying industry. Oliphant perceives itself as an industry leader with regards to the ethical and legal application of debt servicing.

http://www.oliphantfinancial.com/Company (accessed: April 9, 2019).

12. Oliphant is a debt collector as defined in 15 U.S.C. § 1692a.

13. Defendant Alpha Recovery Corp ("ARC") is a foreign corporation with its principal offices located at 6912 South Quentin Street, Suite 10, Centennial, Colorado 80112.

14. ARC is engaged in the business of a collection agency, using the mails and telephone to collect consumer debts originally owed to others.

15. ARC is engaged in the business of collecting debts owed to others and incurred for personal, family, or household purposes.

16. ARC is a debt collector as defined in 15 U.S.C. § 1692a.

17. Defendant Financial Business and Consumer Solutions, Inc., ("FBCS") is a foreign corporation with its principal place of business located at 330 S. Warminster Road, Suite 353, Hatboro, PA 19040. It does business under the fictitious or trade names "FBCS" and "FCBS, Inc."

18. FBCS is engaged in the business of a collection agency, using the mails and telephone to collect consumer debts originally owed to others.

19. FBCS is engaged in the business of collecting debts owed to others and incurred for personal, family or household purposes.

20.     FBCS is a debt collector as defined in 15 U.S.C. § 1692a.

## FACTS

### *Facts Related to the Oliphant Letter*

21.     On or about March 1, 2019, Oliphant mailed a debt collection letter to Plaintiff regarding an alleged debt. A copy of this letter is attached to this Complaint as <u>Exhibit A</u>.

22.     Upon information and belief, the alleged debt referenced in <u>Exhibit A</u> was incurred by use of a consumer credit account, which was used only for personal, family, or household purposes.

23.     Upon information and belief, <u>Exhibit A</u> is a form letter, generated by a computer, and with the information specific to Plaintiff inserted by the computer.

24.     Upon information and belief, <u>Exhibit A</u> is a form debt collection letter, used by Oliphant to attempt to collect alleged debts.

25.     <u>Exhibit A</u> contains confusing and misleading representations about the name of the creditor and the character of the debt.

26.     The header in <u>Exhibit A</u> contains the following:

| Date | 03/01/2019 |
|------|------------|
| Balance | $1,034.53 |
| Current Creditor | Oliphant Financial, LLC |
| Oliphant Account# | ███0110 |
| Original Creditor | Barclays Bank Delaware |
| Original Creditor Acct# | 5.14888E+15 |

27.     The first paragraph of <u>Exhibit A</u> states:

Oliphant Financial, LLC, as the current creditor of your Barclays Bank Delaware, Product (which was facilitated by CreditShop, LLC). Oliphant Financial, LLC. has the ability and desire to present you with a variety of options to satisfy the outstanding balance due.

28.     The header in Exhibit A states that the "Original Creditor" is "Barclays Bank Delaware" ("Barclays") and the "Current Creditor" is Oliphant.

29.     The first sentence in the body of Exhibit A is a confusing sentence fragment.

30.     The first sentence in the body of Exhibit A confusingly refers to the debt as a "Barclays Bank Delaware, Product (which was facilitated by Creditshop, LLC)."

31.     The unsophisticated consumer would be confused about the reference to a Barclays "Product" and would be further confused by the representation that the "Product" was "facilitated" by "Creditshop, LLC."

32.     The representation gives the appearance that Barclays or "Creditshop, LLC" has some interest in the debt and may be a creditor. *See, e.g., Taylor v. Alltran Fin.*, No. 18-cv-306, 2018 U.S. Dist. LEXIS 159862, at *7 (S.D. Ind. Sept. 19, 2018); *see also Braatz v. Leading Edge Recovery Solutions, LLC*, No. 11-cv-3835, at *3-4 (N.D. Ill. Oct. 20, 2011).

33.     In *Taylor*, the district court considered a letter with similar language to Exhibit A, and found that the letter did not clearly identify the name of the creditor to whom the debt was owed:

> Almost immediately after identifying LVNV as the 'Current Creditor,' the letter contradicts this by explaining that Alltran 'has been contracted' to collect on a judgment for Mr. Taylor's Springleaf account. An unsophisticated consumer receiving this letter may well be confused or concerned that two separate companies (LVNV and Springleaf) may be seeking to collect on a single debt. Mr. Taylor has therefore plausibly alleged that Defendants failed to clearly identify the creditor to whom the debt is owed, in violation of § 1692g(a)(2).

*Taylor*, 2018 U.S. Dist. LEXIS 159862, at *9-10 (citing *Braatz v. Leading Edge Recovery Solutions, LLC*, No. 11-cv-3835, 2011 U.S. Dist. LEXIS 123118, at *4 (N.D. Ill. Oct. 20, 2011)).

34.     In *Braatz*, the district court held that a representation that the debt collector was attempting to collect a "delinquent Citibank account" for LVNV was confusing:

> In this case it is true that the notice explains that LVNV is the creditor. If that were the only statement regarding the identify of the creditor, the Court might indeed conclude that as a matter o flaw the dunning letter was not confusing. However, the notice also identifies the debt as belonging to Citibank. Thus the dunning letter identifies two creditors. This is an apparent contradiction that the debt collector fails to explain. An unsophisticated consumer might understand that LVNV had purchased the delinquent Citibank account. That is, however, but one plausible inference to be drawn from the letter. An unsophisticated consumer might just as reasonably conclude that [the debt] she believed to be a single debt was now owed to two separate companies (LVNV and Citibank). Such confusion might cause an unsophisticated consumer to be concerned about the possibility that she was being defrauded or that she might pay the incorrect creditor and continue to have outstanding debt.

*Braatz*, 2011 U.S. Dist. LEXIS 123118, at *3-4.

35.     If anything, Exhibit A is even more confusing than the letters in *Taylor* and *Braatz*. The respective letters in *Taylor* and *Braatz* identified the debts as being a "Springleaf account" and "Citibank account" but each letter also identified Springleaf and Citibank as the "original creditor." In contrast, Exhibit A references the debt as a "Product" owed to or "facilitated" by "Creditshop, LLC." The unsophisticated consumer would be confused by the reference to a "Barclays Bank Delaware, Product," and would further have no idea what "facilitated by Creditshop, LLC" meant in this context, especially because Exhibit A does not identify "Creditshop, LLC" in the header.

36.     Exhibit A also states:

> THIS COMMUNICATION IS AN ATTEMPT TO COLLECT A DEBT BY A DEBT COLLECTOR. ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

37.     In light of the confusing references to Barclays and "Creditshop, LLC," the representation that Oliphant is a "debt collector" creates added confusion because consumers

generally understand that a "debt collector" services debts on behalf of some other entity. *Dewees v. Legal Servicing, LLC*, 506 F. Supp. 2d 128, 133 (E.D.N.Y. 2007) ("This language arguably suggests that the letter is being sent by an agent for the creditor—specially retained for the purpose of collecting the debt—as opposed to the creditor."); *see also, e.g., Dokes v. Ltd. Fin. Servs. L.P.*, 328 F. Supp. 3d 1270, 1286-87 (N.D. Ala. 2018).

38.     The Seventh Circuit recently held that a debt collector must *clearly* identify the current creditor of the debt:

> If the validation notice required under § 1692g(a)(2) does not identify the current creditor clearly and accurately, the law has been violated. A plaintiff need not offer additional evidence of confusion or materiality to prove the violation.

*Janetos v. Fulton Friedman & Gullace, LLP*, 825 F.3d 317, 325 (7th Cir. 2016).

39.     "*Clear* identification of the current creditor serves the important purpose of helping unsophisticated consumers avoid fraud and the potential for double payments." *Taylor*, 2018 U.S. Dist. LEXIS 159862, at *5-6 (S.D. Ind. Sept. 19, 2018) (citing *Janetos*, 825 F.3d at 319 and *Braatz*, 2011 U.S. Dist. LEXIS 123118, at *4).

40.     For this reason, courts hold that a debt collector must clearly and unequivocally identify the current creditor to whom the debt is owed and "a FDCPA plaintiff states a claim when she alleges that the collection letter names the creditor in a manner that is unclear or confusing." *Blarek v. Creditors Interchange*, No. 05-cv-1018, 2006 U.S. Dist. LEXIS 60595, at *3 (E.D. Wis. Aug. 25, 2006); *see also, e.g., Dewees v. Legal Servicing, LLC*, 506 F. Supp. 2d 128, 133 (E.D.N.Y. 2007); *Walls v. United Collection Bureau*, No. 11-cv-6026, 2012 U.S. Dist. LEXIS 68079, at *5 (N.D. Ill. May 16, 2012); *Deschaine v. Nat'l Enter. Sys.*, No. 12-cv-50416, 2013 U.S. Dist. LEXIS 31349, at *3-5 (N.D. Ill. Mar. 7, 2013); *Aribal*, 2013 U.S. Dist. LEXIS 105355, at *12-13; *Braatz*, 2011 U.S. Dist. LEXIS 123118, at *3; *Pardo v. Allied Interstate,*

*LLC*, No. 14-cv-1104, 2015 U.S. Dist. LEXIS 125526, at *8-9 (S.D. Ind. Sept. 21, 2015); *Long v. Fenton & McGarvey Law Firm, P.S.C.*, 223 F. Supp. 3d 773, 778-79 (S.D. Ind. Dec. 9, 2016); *Brinkmeier v. Round Two Recovery, LLC*, No. 15-cv-3693, 2016 U.S. Dist. LEXIS 97664, at *4 (E.D.N.Y. July 25, 2016); *Datiz v. Int'l Recovery Assocs.*, No. 15-cv-3549, 2018 U.S. Dist. LEXIS 127196 (E.D.N.Y. July 27, 2018), *adopted by,* 2018 U.S. Dist. LEXIS 163290 (E.D.N.Y. Sept. 24, 2018); *Smith v. Cohn, Goldberg & Deutsch, LLC*, 296 F. Supp. 3d 754, 761 (D. Md. 2017); *Taylor*, 2018 U.S. Dist. LEXIS 159862, at *7-11.

41.     Moreover, the header in Exhibit A confusingly states that the "Original Creditor Acct#" is "5.14888E+15."

42.     Upon information and belief, the original creditor account number associated with the debt is not actually 5.14888E+15.

43.     Furthermore, upon information and belief, the initial six digits listed as the "Original Creditor Acct#" do not even correspond with the original account number associated with Plaintiff's alleged debt.

44.     Original creditors like Barclays generally provide account numbers that consist of numerals only, and 5.14888E+15 is not in the form of an account number that is regularly used by Barclays or any other original creditor.

45.     The unsophisticated consumer would be further confused and misled by the reference to an account number that is apparently inconsistent with the form of a typical account number.

46.     Alongside the confusing and misleading sentence fragments and references to Barclays and "Creditshop, LLC," the confusing and misleading account number would suggest to the consumer that Oliphant's letter is a scam. *See, Derosia v. Credit Corp. Sols.*, No. 17-cv-

1671, 2018 U.S. Dist. LEXIS 50016, at *10 (E.D. Wis. Mar. 27, 2018) (finding confusing or misleading statement material even though the debt itself was legitimate because "[a] consumer sophisticated enough to do a little homework could be led to reach a conclusion (that the letter was a scam) that would have been wrong.").

47.     Further, upon information and belief, any entity that discovered Plaintiff was issued a Mastercard credit card by Barclays (through either a public records search, credit report, or data breach) might be able to determine that the account would begin with the digits 514888 or a similar number because this is a standard Bank Identification Number ("BIN") for Barclays-issued Mastercard credit cards.

48.     Plaintiff was confused and misled by <u>Exhibit A</u>.

49.     The unsophisticated consumer would be misled and confused by <u>Exhibit A</u>.

### *Facts Related to Claims against ARC*

50.     On or about August 15, 2018, Oliphant mailed a debt collection letter to Plaintiff regarding the same alleged debt owed to Oliphant. A copy of this letter is attached to this Complaint as <u>Exhibit B</u>.

51.     Upon information and belief, <u>Exhibit B</u> is a form letter, generated by a computer, and with the information specific to Plaintiff inserted by the computer.

52.     Upon information and belief, <u>Exhibit B</u> is a form debt collection letter, used by ARC to attempt to collect alleged debts.

53.     Upon information and belief, <u>Exhibit B</u> is the first written communication ARC mailed to Plaintiff regarding this alleged debt.

54.   <u>Exhibit B</u> contains the statutory validation notice that the FDCPA, 15 U.S.C. § 1692g, requires debt collectors provide alleged debtors along with, or within five days of, the initial communication:

Unless you notify this office within 30 days after receiving this notice that you dispute the validity of this debt or any portion thereof, this office will assume this debt is valid. If you notify this office in writing within 30 days after receiving this notice that you dispute the validity of this debt or any portion thereof, this office will obtain verification of the debt or obtain a copy of a judgment and mail you a copy of such judgment or verification. If you request of this office in writing within 30 days after receiving this notice, this office will provide you with the name and address of original creditor, if different from the current creditor.

55.   <u>Exhibit B</u> also includes the following representation:

08/15/2018

**Creditor:** OLIPHANT FINANCIAL, LLC.
**Account Number:** ▮▮▮3853

**Original Creditor:** Barclays Bank Delaware
**Original Creditor Account Number:** ************1327

**Current Balance Claimed Due:** $1,034.53

56.   <u>Exhibit B</u> thus lists an "Original Creditor Account Number" which is different from the "Original Creditor Acct#" listed by Oliphant as well as an "Account Number," ending in 3853 which is different from the account number assigned by Oliphant, ending in 0110.

57.   Confronted with such discrepancies, the unsophisticated consumer would doubt the legitimacy of ARC's collection efforts.

58.   Representations which are misleading to the consumer as to the legitimacy of a debt collector's efforts are material misrepresentations. *See, e.g.*, *Derosia*, No. 17-cv-1671, 2018 U.S. Dist. LEXIS 50016, at *10.

59.     Exhibit B also includes the following representation:



60.     The above symbol is a trademark of ACA International ("ACA"), a trade group in the United States that represents collection agencies, creditors, debt buyers, collection attorneys, and debt collection service providers.

61.     The ACA trademark in Exhibit B is an affirmative representation that ARC was a Member of ACA when it mailed Exhibit B.

62.     ACA is the largest trade group in the collection industry, and the ACA's mark imparts a sense of legitimacy to the collection effort.

63.     The ACA provides updates to collection agencies through seminars and literature to ACA's members that address compliance and regulatory matters and trends in the law.

64.     The ACA has a Member Code of Conduct, to which ACA members must agree to adhere. *See* ACA International, Code of Conduct (adopted September 28, 2016) (available at: https://www.acainternational.org/assets/code-of-conduct/2016-code-of-conduct.pdf)     (accessed: May 24, 2019).

65.     Canon III of the ACA Code of Conduct ("Canon III") provides strict rules for ACA's members in dealing with consumers.

66.     For example, Canon III requires that ACA's members go beyond mere compliance with the law to avoid unnecessary confusion, including by "providing an amount,

type, or frequency of information which is not required by law in order to facilitate understanding and dispel misinformation."

67.    Canon III also requires that collection agencies appropriately tailor employee incentives and individual discipline relating to compliance.

68.    Canon III also requires ACA members establish and maintain policies and processes to prevent disclosure of personal sensitive or confidential information, and take corrective action in cases of improper disclosure.

69.    Canon III also requires ACA members implement risk management and supervisory measures to ensure consumer account data is accurate and that the debts the ACA member is collecting are legitimate and owed by the consumer.

70.    Upon information and belief, ARC is not, in fact, a member of ACA.

71.    A search of the Member Directory on ACA's website did not return an entry for ARC as a member.

72.    A false statement about a debt collector's affiliation with a trade group like ACA is a material false statement.

73.    Plaintiff was confused and misled by Exhibit B.

74.    The unsophisticated consumer would be confused and misled by Exhibit B

*__Facts Related to Claims against FBCS__*

75.    On or around May 16, 2019, FBCS mailed a debt collection letter to Plaintiff regarding the same alleged debt owed to Oliphant. A copy of this letter is attached to this complaint as Exhibit C.

76.    Upon information and belief, Exhibit C is a form letter, generated by a computer, and with the information specific to Plaintiff inserted by the computer.

12

77.     Upon information and belief, <u>Exhibit C</u> is a form debt collection letter, used by FBCS to attempt to collect alleged debts.

78.     Upon information and belief, <u>Exhibit C</u> is the first written communication FBCS mailed to Plaintiff regarding this alleged debt.

79.     <u>Exhibit C</u> contains the statutory validation notice that the FDCPA, 15 U.S.C. § 1692g, requires debt collectors provide alleged debtors along with, or within five days of, the initial communication:

> Unless you notify this office within 30 days after receiving this notice that you dispute the validity of this debt or any portion thereof, this office will assume this debt is valid. If you notify this office in writing within 30 days from receiving this notice, that the debt or any portion thereof is disputed, this office will obtain verification of the debt or obtain a copy of a judgment and mail you a copy of such judgment or verification. If you request this office in writing within 30 days after receiving this notice, this office will provide you the name and address of the original creditor, if different from the current creditor.

80.     <u>Exhibit C</u> also includes the following offer to settle Plaintiff's alleged debt for $775.90:

> 1. Pay the full amount of $775.90 to us in one payment.
> 2. Pay $155.18 as a down-payment and the remaining balance of $620.72 30 days after your 1st payment is received.
> 3. You may have an opportunity to split your settlement into 6 payments of $129.32 each. Call our office for details.
> 4. Contact one of our agents, who have been specially trained to listen to your circumstances and guide you through the process, there may be other payment options available based on your specific situation.  Call us, toll free, at 1-866-594-8639.  Agents trained to handle your specific account are available:

81.     <u>Exhibit C</u> states: "FBCS, Inc. is not obligated to renew this offer."

82.     <u>Exhibit C</u> does not provide a settlement expiration date upon which the offer would need to be renewed.

83.     Upon information and belief, the statement that FBCS is "not obligated to renew these offers," is a material false, deceptive, and misleading statement.

84.     In the absence of an expiration date, the unsophisticated consumer would understand a statement that the debt collector is "not obligated to renew this offer," to mean that FBCS could, and would, rescind the settlement offer at any time and without notice.

85.     Upon information and belief, the debtor can settle the account for $$775.90, or less, at any time.

86.     In order to preserve debt collectors' negotiating positions and prevent the settlement process from disintegrating, while still enforcing the congressional mandate prohibiting debt collectors from making false, deceptive, and misleading representations, the Seventh Circuit has established "safe harbor" language regarding settlement offers in collection letters:

> As in previous cases in which we have created safe-harbor language for use in cases under the Fair Debt Collection Practices Act, we think the present concern can be adequately addressed yet the unsophisticated consumer still be protected against receiving a false impression of his options by the debt collector's including with the offer the following language: "We are not obligated to renew this offer." The word "obligated is strong and even the unsophisticated consumer will realize that there is a renewal possibility but that it is not assured.

*Evory*, 505 F.3d 769 at 775-76.

87.     While Exhibit C tracks this safe-harbor language, without an expiration date, the language does not have its intended effect.

88.     As a practical matter, the unsophisticated consumer is not an FDCPA lawyer. They do not know that the purpose of the statement that "we are not obligated to renew this offer" is to make them "realize that there is a renewal possibility but that it is not assured."

89.     Instead, where the debt collector states that it is not obligated to renew an offer but does not include an expiration date by which payment must be made, the unsophisticated consumer would understand the safe-harbor language to mean that the offer was subject to revocation at any time.

90.     The unsophisticated consumer may even believe that the law requires a debt collector to include the safe-harbor language if it intends to rescind the offer.

91.     Without an expiration date, the unsophisticated consumer would interpret a debt collector's statement that it is "not obligated to renew" as an implied threat to revoke the settlement offer at any time and without notice.

92.     Where the Seventh Circuit prescribes safe-harbor language, this language is not "blessed" as generally acceptable---rather, the Seventh Circuit has made it clear that its safe-harbor language applies only in the specific "type" of case addressed in the opinion and that very language may, in fact, violate the FDCPA under other circumstances. *E.g., Boucher v. Fin. Sys. of Green Bay*, 2018 U.S. App. LEXIS 1094, at *17 (7th Cir. 2018) ("debt collectors cannot immunize themselves from FDCPA liability by blindly copying and pasting the *Miller* safe harbor language without regard for whether that language is accurate under the circumstances."); *Evory*, 505 F.3d at 775-76 ("we think the *present concern* can be adequately addressed . . ."); *Bartlett v. Heibl*, 128 F.3d 497, 501 (7th Cir. 1997) ("We commend this redaction as a safe harbor . . . for the kind of suit Bartlett has brought and now won. The qualification 'for the kind of suit that Bartlett has brought and now won' is important. We are not certifying our letter against challenges based on other provisions of the statute; those provisions are not before us."); *see also O'Chaney v. Shapiro and Kreisman, LLC*, 2004 U.S. Dist LEXIS 5116, at *13 (N.D. Ill. Mar. 25, 2004) (rejecting the argument that a debt collector could avoid liability for use of safe harbor language where the Seventh Circuit expressly limited the reach of the language to different claims).

93.     The safe-harbor language used in <u>Exhibit C</u> was created specifically for cases where a debt collection letter stated a settlement date certain. Without a date certain, the language is false, deceptive, misleading, and confusing, and gives rise to FDCPA liability. *E.g., Al v. Van Ru Credit Corp.*, 2018 U.S. Dist. LEXIS 70321, at *9 (E.D. Wis. Apr. 26, 2018).

94.     Moreover, FBCS's failure to provide an expiration date for its settlement offer is a material misrepresentation because it misleads the unsophisticated consumer about a material term of the settlement offer. *Evory*, 505 F.3d at 775-76; *see Smith v. Nat'l Enter. Sys., Inc.*, 2017 U.S. Dist. LEXIS 47701, *13 (W.D. Okla. Mar. 30, 2017) (because debt collector's purported time-sensitive settlement offer included an obviously misprinted expiration date that had already passed, "any consumer receiving [it] would be left to wonder about a material term of the offer, that is, the deadline for acceptance.").

95.     The unsophisticated consumer, not knowing when the settlement offer expired, would feel intimidated into paying. *Muha v. Encore Receivable Mgmt.*, 558 F.3d 623, 629 (7th Cir. 2009) ("Confusing language in a dunning letter can have an intimidating effect by making the recipient feel that he is in over his head and had better pay up rather than question the demand for payment.").

96.     Moreover, providing the settlement offer alongside the validation notice contradicts and overshadows the consumer's validation rights.

97.     The settlement offer in Exhibit C is confusing to the unsophisticated consumer because it requires that the consumer tender a payment within the validation period or shortly thereafter, but does not explain how the validation notice and settlement "deadline" fit together. *Bartlett v. Heibl*, 128 F.3d 497, 500 (7th Cir. 1997) ("In the typical case, the letter both demands payment within thirty days and explains the consumer's right to demand verification within thirty days. These rights are not inconsistent, but by failing to explain how they fit together the letter confuses.").

98.     The unsophisticated consumer, unsure when the settlement offer in Exhibit C expires, would feel compelled to make a settlement payment as soon as possible, and during the

validation period, to ensure the settlement offer had not expired without notice prior to her tendering of payment. Thus, there is an apparent contradiction between the settlement offer and the validation notice.

99.     The unsophisticated consumer would be confused about whether the settlement offer in Exhibit C would require her to forego her rights to validate the debt.

100.     The unsophisticated consumer would not know whether requesting verification of the debt would be interpreted as a rejection of the settlement offer.

101.     The plain language of Exhibit C is unclear as to how the debt collector would proceed in the event that the consumer mailed a dispute along with a payment that was intended to accept the settlement offer in the case that the debt could be verified.

102.     Where a consumer mailed a dispute along with a payment that was intended to accept a settlement offer in Exhibit C, under the terms of Exhibit C, the debt collector might:

> a. Hold the payment in escrow pending verification of the debt;
>
> b. Interpret the payment as an accord and satisfaction and settlement in full that contractually bars the consumer from requesting verification of the debt; or
>
> c. Send the payment back to the consumer pending verification of the debt, in which case the consumer may no longer be able to settle the debt because the offer would have expired while the debt collector was obtaining verification.

103.     Where a consumer mails a dispute along with a payment that was intended to accept a settlement offer with an impending expiration date, whether the FDCPA requires a debt collector to proceed along any of the above paths is an open question in the Seventh Circuit. *See Bailey v. TRW Receivables Management Services, Inc.*, 1990 U.S. Dist. LEXIS 19638, *7-8 (D. Haw. Aug. 16, 1990) ("There is nothing in the statute which indicates that a debt collector is not required to provide verification where a consumer requests it after paying the debt.").

104. Whether accepting payment, or even holding payment pending verification, is a "further attempt to collect the debt" is an open question in the Seventh Circuit. *See Sambor v. Omnia Credit Servs.*, 183 F. Supp. 2d 1234, 1243 (D. Haw. Feb. 5, 2002) ("Because the debt collector in *Bailey* had already collected the debt, there was no collection to 'cease' pending validation. In *Bailey*, keeping the consumer's money was tantamount to continuing collection activity.").

105. The unsophisticated consumer would be confused as to whether she had effectively exercised her validation rights by sending a payment along with a dispute letter.

106. The unsophisticated consumer may unwittingly reject a settlement offer by tendering the settlement payment along with her dispute letter. If the debt collector treated the acceptance of a settlement offer as a continuing attempt to collect a debt, *see Sambor*, 183 F. Supp. 2d at 1243, the debt collector would need to return the settlement payment pending verification of the debt.

107. Because the debt collector may be legally obligated to return the consumer's settlement payment pending verification of the debt, the offer may lapse before the consumer had effectively made the settlement payment. By the time the debt collector verified the debt, the consumer would have missed her chance to settle the debt even though she attempted to tender a payment before the expiration date.

108. Moreover, the unsophisticated consumer would have no idea how to both seek verification of the debt and preserve the settlement offer in <u>Exhibit C</u>.

109. The consumer needs time to process the information contained in an initial debt collection letter before deciding whether to dispute, pay or take other action. This is the point of the 30 day period in 15 U.S.C. 1692g(a). *See Jacobson v. Healthcare Fin. Servs.*, 516 F.3d 85,

95 (2d Cir. 2008) ("the aim of § 1692g is to provide a period for the recipient of a collection letter to consider her options.").

110.     Prior to deciding whether to dispute a debt, a consumer may have to sort through personal records and/or memories to try to remember if the debt might be legitimate. She may not recognize the creditor – debts are freely assignable and corporations, especially banks, often change names.

111.     The § 1692g validation period lasts for 30 days. It is the consumer's right to *request* verification until the end of the thirty day period. If the request is not made until the end of the thirty day period, the verification request would not be processed, researched by the creditor, and returned to the consumer until long after settlement offer payment deadline has expired. The consumer would be left with no time to review the verification and determine whether to accept the settlement offer.

112.     The unsophisticated consumer would have no idea how to both seek verification of the debt and preserve the settlement offers in <u>Exhibit C</u>. The unsophisticated consumer would believe that the settlement offer would expire before the debt collector provides verification and would be left with little or no time to review the verification and determine whether to accept the settlement offer.

113.     The effect of the settlement offer in the initial written debt communication is to discourage or prevent consumers from exercising their validation rights.

114.     Defendant's "explanatory language" in <u>Exhibit C</u>, *see, e.g.*, *Bartlett*, 128 F.3d 497, 501-02 (7th Cir. 1997), does not clarify how---or even whether---a debtor may both dispute the debt and take advantage of the settlement.

115.    Any explanatory language should make clear whether a dispute will extend the settlement offer while the debt collector is in the process of complying with its obligation to verify the debt.

116.    Plaintiff was misled and confused by <u>Exhibit C</u>.

117.    The unsophisticated consumer would be misled and confused by <u>Exhibit C</u>.

### *The FDCPA*

118.    The FDCPA creates substantive rights for consumers; violations cause injury to consumers, and such injuries are concrete and particularized. *Derosia v. Credit Corp Solutions*, 2018 U.S. Dist. LEXIS 50016, at *12 (E.D. Wis. Mar. 27, 2018) ("'a plaintiff who receives misinformation form a debt collector has suffered the type of injury the FDCPA was intended to protect against' and 'satisfies the concrete injury in fact requirement of Article III.'") (quoting *Pogorzelski v. Patenaude & Felix APC*, 2017 U.S. Dist. LEXIS 89678, 2017 WL 2539782, at *3 (E.D. Wis. June 12, 2017)); *Spuhler v. State Collection Servs.*, No. 16-CV-1149, 2017 U.S. Dist. LEXIS 177631 (E.D. Wis. Oct. 26, 2017) ("As in Pogorzelski, the Spuhlers' allegations that the debt collection letters sent by State Collection contained false representations of the character, amount, or legal status of a debt in violation of their rights under the FDCPA sufficiently pleads a concrete injury-in-fact for purposes of standing."); *Lorang v. Ditech Fin. LLC*, 2017 U.S. Dist. LEXIS 169286, at *6 (W.D. Wis. Oct. 13, 2017) ("the weight of authority in this circuit is that a misrepresentation about a debt is a sufficient injury for standing because a primary purpose of the FDCPA is to protect consumers from receiving false and misleading information."); *Neeley v. Portfolio Recovery Assocs., LLC*, 268 F. Supp. 3d 978, 982 (S.D. Ind. Aug. 2, 2017) ("[N]othing in *Spokeo* overruled the Seventh Circuit's decisions that emphasized and affirmed the power of Congress to pass legislation creating new rights, which if violated, would confer

standing under Article III.") (alteration in original) (quoting *Saenz v. Buckeye Check Cashing*, 2016 U.S. Dist. LEXIS 127784, at *5 (N.D. Ill. Sep. 20, 2016); *Qualls v. T-H Prof'l & Med. Collections, Ltd.*, 2017 U.S. Dist. LEXIS 113037, at *8 (C.D. Ill. July 20, 2017) ("Courts in this Circuit, both before and after *Spokeo*, have rejected similar challenges to standing in FDCPA cases.") (citing "*Hayes v. Convergent Healthcare Recoveries, Inc.*, 2016 U.S. Dist. LEXIS 139743 (C.D. Ill. 2016)); *Bock v. Pressler & Pressler, LLP*, No. 11-7593, 2017 U.S. Dist. LEXIS 81058 *21 (D.N.J. May 25, 2017) ("through [s]ection 1692e of the FDCPA, Congress established 'an enforceable right to truthful information concerning' debt collection practices, a decision that 'was undoubtedly influenced by congressional awareness that the intentional provision of misinformation' related to such practices, 'contribute[s] to the number of personal bankruptcies, to marital instability, to the loss of jobs, and to invasions of individual privacy,"); *Quinn v. Specialized Loan Servicing, LLC*, No. 16 C 2021, 2016 U.S. Dist. LEXIS 107299 *8-13 (N.D. Ill. Aug. 11, 2016) (rejecting challenge to Plaintiff's standing based upon alleged FDCPA statutory violation); *Lane v. Bayview Loan Servicing, LLC*, No. 15 C 10446, 2016 U.S. Dist. LEXIS 89258 *9-10 (N.D. Ill. July 11, 2016) ("When a federal statute is violated, and especially when Congress has created a cause of action for its violation, by definition Congress has created a legally protected interest that it deems important enough for a lawsuit."); *see also Mogg v. Jacobs*, No. 15-CV-1142-JPG-DGW, 2016 U.S. Dist. LEXIS 33229, 2016 WL 1029396, at *5 (S.D. Ill. Mar. 15, 2016) ("Congress does have the power to enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute," (quoting *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 623 (7th Cir. 2014)). For this reason, and to encourage consumers to bring FDCPA actions, Congress authorized an award of statutory damages for violations. 15 U.S.C. § 1692k(a).

119.    Moreover, Congress has explicitly described the FDCPA as regulating "abusive practices" in debt collection. 15 U.S.C. §§ 1692(a) – 1692(e). Any person who receives a debt collection letter containing a violation of the FDCPA is a victim of abusive practices. *See* 15 U.S.C. §§ 1692(e) ("It is the purpose of this subchapter to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses").

120.    Misrepresentations of the character, amount or legal status of any debt, injures or risks injury to interests expressly protected by Congress in the FDCPA. *See Richardson v. Diversified Consultants*, No. 17-cv-4047, 2019 U.S. Dist. LEXIS 118786 *10-11 (N.D. Ill. July 17, 2019) ("the receipt of a communication misrepresenting the character of the debt (here, the amount owed) is the kind of injury that Congress sought to prevent through the FDCPA. 'Such an injury falls squarely within the ambit of what Congress gave consumers in the FDCPA: 'a legally protected interest in certain information about debts,' with 'deprivation of information about one's debt (in a communication directed to the plaintiff consumer) a cognizable injury.'" (internal citations omitted); *see also Pierre v. Midland Credit Mgmt., Inc.*, 2017 WL 1427070, at *4 (N.D. Ill. Apr. 21, 2017); *Saenz v. Buckeye Check Cashing of Illinois*, 2016 WL 5080747, at *1-2 (N.D. Ill. Sept. 20, 2016); *Bernal v. NRA Grp., LLC*, 318 F.R.D. 64, 72 (N.D. Ill. 2016) (holding that Plaintiff had standing to challenge misleading communication sent to him because the communication violated his "right to be free from such misleading communications"). Such misrepresentations may cause consumers to make incorrect decisions about their finances or make payments to incorrect parties.

121.    15 U.S.C. § 1692e generally prohibits a debt collector from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt."

122.    15 U.S.C. § 1692e(1) specifically prohibits the false representation that "the debt collector is vouched for, bonded by, or affiliated with the United States or any State, including the use of any badge, uniform, or facsimile thereof."

123.    15 U.S.C. § 1692e(2)(A) specifically prohibits "the character, amount, or legal status of any debt."

124.    15 U.S.C. § 1692e(9) specifically prohibits "the use or distribution of any written communication which simulates or is falsely represented to be a document authorized, issued, or approved by any court, official, or agency of the United States or any State, or which creates a false impression as to its source, authorization, or approval."

125.    15 U.S.C. § 1692e(10) specifically prohibits "the use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer."

126.    15 U.S.C. § 1692g(a) provides, in relevant part, that:

Within five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector shall, unless the following information is contained in the initial communication or the consumer has paid the debt, send the consumer a written notice containing—

(2) the name of the creditor to whom the debt is owed[.]

127.    15 U.S.C. § 1692g(b) provides, in relevant part, that:

Any collection activities and communication during the 30-day period may not overshadow or be inconsistent with the disclosure of the consumer's right to . . . request the name and address of the original creditor.

## COUNT I – FDCPA

128.     Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

129.     Count I is brought against Defendant Oliphant.

130.     <u>Exhibit A</u> contains confusing and misleading sentence fragments.

131.     <u>Exhibit A</u> does not clearly identify the name of the current creditor.

132.     <u>Exhibit A</u> contains confusing and misleading representations that suggest that Barclays and/or "Creditshop, LLC" have some interest in the debt.

133.     <u>Exhibit A</u> misrepresents the original creditor's account number of Plaintiff's alleged debt.

134.     Defendant violated 15 U.S.C. §§ 1692e, 1692e(2)(A), and 1692e(10).

## Count II – FDCPA

135.     Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

136.     Count II is brought against Defendants Oliphant and ARS.

137.     <u>Exhibit B</u> misrepresents the account number of the alleged debt of Plaintiff's alleged debt.

138.     Defendant violated 15 U.S.C. §§ 1692e, 1692e(2)(A), and 1692e(10).

## COUNT III – FDCPA

139.     Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

140.     Count III is brought against Defendants Oliphant and ARS.

141.     <u>Exhibit B</u> falsely states that Alpha is a member of ACA International.

142.    Defendant violated 15 U.S.C. §§ 1692e, 1692e(1), 1692e(9), and 1692e(10).

## COUNT IV – FDCPA

143.    Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

144.    Count IV is brought against Defendants Oliphant and FBCS.

145.    By including a settlement offer without an expiration date while simultaneously stating "FBCS, Inc. is not obligated to renew this offer," Exhibit C falsely threatens to revoke the settlement offer and thereby overshadows the validation notice.

146.    Defendant violated 15 U.S.C. §§ 1692e, 1692e(5), 1692e(10), 1692f, and 1692g(b).

## CLASS ALLEGATIONS

147.    Plaintiff brings this action on behalf of a three classes

148.    Class I consists of: (a) all natural persons in the State of Wisconsin (b) who were sent a collection letter in the form represented by Exhibit A to the Complaint in this action, (c) seeking to collect a debt for personal, family or household purposes, (d) mailed between May 14, 2018 and May 14, 2019, inclusive, (e) that was not returned by the postal service.

149.    Class II consists of: (a) all natural persons in the State of Wisconsin (b) who were sent a collection letter in the form represented by Exhibit B to the Complaint in this action, (c) seeking to collect a debt for personal, family or household purposes, (d) mailed between July 19, 2018 and July 19, 2019, inclusive, (e) that was not returned by the postal service.

150.    Class III consists of: (a) all natural persons in the State of Wisconsin (b) who were sent a collection letter in the form represented by Exhibit C to the Complaint in this action,

(c) seeking to collect a debt for personal, family or household purposes, (d) mailed between July 19, 2018 and July 19, 2019, inclusive, (e) that was not returned by the postal service.

151.     Each class is so numerous that joinder is impracticable. Upon information and belief, there are more than 50 members of each class.

152.     There are questions of law and fact common to the class members, which common questions predominate over any questions that affect only individual Class members. The predominant common question is whether the Defendants complied with the FDCPA.

153.     Plaintiff's claims are typical of the claims of the class members. All are based on the same factual and legal theories.

154.     Plaintiff will fairly and adequately represent the interests of the class members. Plaintiff has retained counsel experienced in consumer credit and debt collection abuse cases.

155.     A class action is superior to other alternative methods of adjudicating this dispute. Individual cases are not economically feasible.

## JURY DEMAND

156.     Plaintiff hereby demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court enter judgment in favor of Plaintiff and the Class and against Defendant for:

(a)     actual damages;

(b)     statutory damages;

(c)     attorneys' fees, litigation expenses and costs of suit; and

(d)     such other or further relief as the Court deems proper.

Dated: July 19, 2019

**ADEMI & O'REILLY, LLP**

By:    <u>/s/ Mark A. Eldridge     </u>
       John D. Blythin (SBN 1046105)
       Mark A. Eldridge (SBN 1089944)
       Denise L. Morris (SBN 1097911)
       Jesse Fruchter (SBN 1097673)
       Ben J. Slatky (SBN 1106892)
       3620 East Layton Avenue
       Cudahy, WI 53110
       (414) 482-8000
       (414) 482-8001 (fax)
       jblythin@ademilaw.com
       meldridge@ademilaw.com
       dmorris@ademilaw.com
       jfruchter@ademilaw.com
       bslatky@ademilaw.com